```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

                Plaintiff,

       - against -

REAL PROPERTY LOCATED AT:

115-98 PARK LANE SOUTH
KEW GARDENS, NY 11418;

107-24 71st ROAD, PH3B
FOREST HILLS, NY 11375;

83-83 115th STREET
RICHMOND HILLS, NY 11418;

119 RALPH AVENUE
BROOKLYN, NEW YORK 11221;

9 OAKLEY STREET
MASSAPEQUA, NY 11758;

245 MCKINLEY AVENUE
ISLAND PARK, NY 11558;

and all proceeds traceable thereto.

                Defendants.

- - - - - - - - - - - - - - - - - -X
```

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ AUG 13 2010 ★
BROOKLYN OFFICE

VERIFIED COMPLAINT
IN REM

Civil Action No.
**10 cv 3748**

(_____, J.)

(_____, M.J.)

**WEINSTEIN, J.**

Plaintiff United States of America, by its attorney, LORETTA E. LYNCH, United States Attorney for the Eastern District of New York, Artemis Lekakis, Assistant United States Attorney, of counsel, alleges the following upon information and belief:

**PRELIMINARY STATEMENT**

1.  This is a civil action <u>in</u> <u>rem</u> to forfeit and condemn to the use of the United States the above-captioned defendant property, in accordance with 18 U.S.C. §981(a)(1)(C), as real property which constitutes or is derived from proceeds traceable to the commission of bank fraud and, pursuant to 18 U.S.C. § 981(A)(1)(a), as property involved in money laundering under 18 U.S.C. § 1956(a)(1)(A)(i) and (a)(1)(B)(i) in violation of Title 18 U.S.C. § 1344.

**JURISDICTION AND VENUE**

2.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

3.  Venue lies in the Eastern District of New York pursuant to 28 U.S.C. §§ 1355 and 1395.

**THE DEFENDANTS IN REM**

4.  The above-captioned defendant properties consist of the real property, together with their respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings, located at:

> (a) 115-98 Park Lane South, Kew Gardens, New York 11418, designated as block 3319, lot 10, in the County of Queens in the City of New York (the "Mansion Property") and all proceeds traceable thereto;
>
> (b) 107-24 71st Road, PH3B, Forest Hills, New York 11375, designated as block 3257, lot 1042, in the

County of Queens in the City of New York (the "Penthouse Property") and all proceeds traceable thereto;

(c) 83-83 115th Street, Richmond Hills, New York 11418, designated as block 9209, lot 76, in the County of Queens in the City of New York (the "83-83 Property") and all proceeds traceable thereto;

(d) 119 Ralph Avenue, Brooklyn, New York 11221, designated as block 1487, lot 5, in the County of Kings in the City of New York (the "Ralph Avenue Property") and all proceeds traceable thereto;

(e) 9 Oakley Street, Massapequa, New York 11758, designated as section 53, block 8, lot 2,4, 6, 8, in the County of Nassau in the State of New York (the "Oakley Street Property") and all proceeds traceable thereto;

(f) 245 McKinley Avenue, Island Park, NY 11558, designated as section 43, block 155, lot 17-19, in the County of Nassau in the State of New York (the "McKinley property") and all proceeds traceable thereto;

(hereinafter all the defendant properties-in-rem and all proceeds traceable thereto collectively shall be referred to as the "Defendant Properties-In-Rem").

**STATUTORY BACKGROUND**

5. Pursuant to 18 U.S.C. § 981(a)(1)(C), all property, real or personal, which constitutes or is derived from proceeds traceable to a violation of bank fraud, as set forth in 18 U.S.C. § 1344, is subject to forfeiture by the United States.

6. In relevant part, 18 U.S.C. § 1344 prohibits the knowing execution, or attempt to execute, a scheme or artifice "to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody and control of, a financial institution by means of false or fraudulent pretenses, representations or promises."

7. Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, or any property traceable to such property, is property subject to forfeiture to the United States.

8. In relevant part, 18 U.S.C. § 1956(a)(1)(A)(i) prohibits the knowing execution, or attempt to execute, of a financial transaction where a party knows that the property involved represents the proceeds of some form of unlawful activity and which in fact involves the proceeds of specified unlawful activity, with the intent to promote the carrying on of such specified unlawful activity.

9. In relevant part, 18 U.S.C. § 1956(a)(1)(B)(i) prohibits the knowing execution, or attempt to execute, of a

financial transaction where a party knows that the property involved represents the proceeds of some form of unlawful activity and which in fact involves the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

## FACTS

### The Mortgage Fraud Scheme And Fraud Proceeds

10. From approximately December 2004 until approximately December 2005, Irina Khaimov was a partner and office manager at New Generation Funding ("NGF"), a mortgage brokerage firm.

11. Beginning in or around March 2006, agents of the Federal Bureau of Investigation began investigating the activities of Irina Khaimov.

12. The investigation of Irina Khaimov's activities at NGF began after two mortgage lenders, Fremont Investment and Loan ("Fremont") and Long Beach Mortgage ("Long Beach") stopped doing business with NGF because of an unusually high rate of defaults on loans brokered by NGF.

13. Fremont and Long Beach investigated the loans, found indications of fraud and reported this suspicious activity to the law enforcement community.

14. Audits of the mortgage loan applications submitted by NGF revealed a pattern of fraud and numerous false statements.

15. These false statements in the loan applications included false employment information, grossly inflated income, fraudulent identity documents, failure to disclose other liabilities and grossly inflated assets.

16. As a partner and office manager at NGF, Irina Khaimov participated in and coordinated these mortgage fraud schemes.

17. The proceeds to Irina Khaimov from these mortgage fraud schemes was approximately $500,000 during calendar year 2005.

18. After December 2005, Irina Khaimov, along with her husband, Joseph Khaimov, left NGF and opened a new office where they originated loans using the license of Exoro Funding ("Exoro").

19. At Exoro, Irina Khaimov embarked on so-called foreclosure rescue operations.

20. The foreclosure rescue operations that Irina Khaimov ran at Exoro were another mortgage fraud scheme.

21. Pursuant to this scheme, Irina Khaimov would strip the equity from homes that were in foreclosure by convincing the homeowners to sell the homes to straw buyers based on promises of credit repair and/or the possibility of buying back their homes at a future date.

22. As part of this mortgage fraud scheme, Irina Khaimov prepared the fraudulent mortgage applications for the straw buyers.

23. These applications contained false information, including, but not limited to, statements that the property would be the buyer's primary residence and stated monthly incomes for the buyers that was grossly inflated.

24. The mortgage loan applications that Irina Khaimov prepared also often included fraudulent verification of employment and rent, and fraudulent bank statements.

25. The proceeds from this equity-stripping foreclosure rescue operation were approximately an additional $5.5 million.

26. Irina Khaimov formed shell corporations and corporate entities into which she could deposit the proceeds of her mortgage and bank fraud and that she used in furtherance of her mortgage fraud and bank fraud schemes.

27. The names of such corporations and corporate entities included, but were not limited to, Nikki Kind, Inc., BNA Management Systems and Coster Callus, Inc.

28. Irina Khaimov controlled the bank accounts for these shell corporations.

29. Irina Khaimov distributed the proceeds of her mortgage fraud schemes into one or more of these shell corporations, including, but not limited to, Nikki Kind and BNA Management Systems.

30. Law enforcement officers first contacted Irina Khaimov about the investigation into her mortgage fraud schemes on or about February 2007.

31. At the time that she was contacted, Irina Khaimov was aware that she was a person of interest in the investigation.

32. On or about December 6, 2007, Irina Khaimov was arrested without incident.

33. On or about April 30, 2010, Irina Khaimov pled guilty to conspiracy to commit bank fraud.

34. On or about May 25, 2010, the Order of Forfeiture was entered that forfeited Irina Khaimov's interest in, inter alia, the Defendant Properties-In-Rem.

**The Defendants-In-Rem Were Acquired
With the Proceeds of Bank Fraud and/or
By Means of Fraudulent Misrepresentations**

35. Basanda Khaimov is Irina Khaimov's mother.

36. Zhora Tabibov is Irina Khaimov's step-father.

37. Mark Tabibov is Irina Khaimov's step-brother.

38. Upon information and belief, for several years, including, but not limited to, the period from 2003-2007, Basanda Khaimov has been employed as a home attendant and cook.

39. Upon information and belief, during this period, Basanda Khaimov's annual income has been approximately $19,000 per year.

40. Upon information and belief, for several years, including, but not limited to, the period from 2003-2007, Zhora Tabibov has been employed as an engineer.

41. Upon information and belief, during this period, Zhora Tabibov's average annual income has been approximately $40,000 per year.

42. Upon information and belief, for several years, including, but not limited to, the period from 2003-2007, Mark Tabibov has been a student.

43. Upon information and belief, during this period, Mark Tabibov did not have any reported annual income.

> The Mansion Property Was Acquired With
> The Proceeds of Bank Fraud and/or
> <u>With Fraudulent Representations</u>

44. On or about April 27, 2007, Irina Khaimov purchased the Mansion Property for $3.0 million.

45. At the time of purchase, Irina Khaimov took out a $2.1 million mortgage on the Mansion Property.

46. In purchasing the Mansion Property, Irina Khaimov made a down payment of approximately $900,000.

47. The monies that Irina Khaimov used for the down payment of the Mansion Property were the proceeds of the mortgage fraud and bank fraud described in paragraphs 11-29 above.

48. In addition, on or about April 27, 2007, Irina Khaimov made fraudulent representations to her mortgage lender in order to qualify for the $2.1 million mortgage that she took out on the Mansion Property.

49. These fraudulent representations included Irina Khaimov's grossly inflating her assets and falsely representing

the nature and duration of her employment history.

50. In or around February 2007, Irina Khaimov had become aware of the FBI's investigation of her mortgage fraud.

51. On September 28, 2007, after becoming aware of these investigations, Irina Khaimov conveyed 90% of the Mansion Property to three of her family members; as follows: 30% to her mother, Basanda Khaimov, 30% to her step-father, Zhora Tabibov, and 30% to her step-brother, Mark Tabibov.

52. In the transfer documents for the Mansion Property, Basanda Khaimov, Zhora Tabibov, and Mark Tabibov (hereinafter the "Khaimovs") made fraudulent representations, including, but not limited to, the representation that the Mansion Property was their primary residence.

53. Upon information and belief, the annual mortgage payments and real estate taxes for the $2.1 million mortgage on the Mansion Property are in excess of the Khaimovs' combined annual income.

54. Upon information and belief, to the extent that payments have been made on the Mansion Property, these payments have been made with the proceeds of mortgage fraud and bank fraud.

### The Penthouse Property Was Acquired With The Proceeds of Bank Fraud and/or With Fraudulent Representations

55. On or about February 23, 2006, Irina Khaimov purchased the Penthouse Property for $1.24 million.

56. At the time of purchase, Irina Khaimov took out a $930,000 mortgage on the Penthouse Property.

57. Upon information and belief, on or around February 23, 2006, Irina Khaimov made a down payment of approximately $310,000 on the Penthouse Property.

58. The $310,000 that Irina Khaimov used for the down payment of the Penthouse Property were the proceeds of the mortgage fraud and bank fraud described in paragraphs 11-29 above.

59. In addition, on or about February 23, 2006, Irina Khaimov made fraudulent representations to her mortgage lender in order to qualify for the $930,000 mortgage on the Penthouse Property.

60. These fraudulent representations included grossly overstating her assets and making false statements about the nature and quality of her employment history.

61. In or around February 2007, Irina Khaimov had become aware of the FBI's investigation of her mortgage fraud.

62. After becoming aware of these investigations, on or about October 1, 2007, Irina Khaimov conveyed 90% of the Penthouse property to three of her family members; as follows: 30% to her mother, Basanda Khaimov, 30% to her step-father, Zhora Tabibov, and 30% to her step-brother, Mark Tabibov.

63. In the transfer documents conveying 90% of the ownership interest of the Penthouse Property to the Khaimovs, the Khaimovs made fraudulent representations, including that the Penthouse Property was their primary residence.

64. These false representations were made three days after the false representations that the Khaimovs had made in the transfer documents for the Mansion Property in which they stated that the Mansion Property was their primary residence.

65. Upon information and belief, the annual real estate taxes and mortgage payments for the $900,000 mortgage on the Penthouse Property are in excess of the Khaimovs' combined annual income.

66. Upon information and belief, to the extent that payments have been made on the Penthouse Property, these payments have been made with the proceeds of mortgage fraud and bank fraud.

**The 83-83 Property Was Acquired With
The Proceeds of Bank Fraud and/or
With Fraudulent Representations and
<u>Was Used To Perpetuate Other Frauds</u>**

67. Upon information and belief, during calendar year 2002, Irina Khaimov purchased the 83-83 Property for approximately $410,000.

68. Afterwards, Irina Khaimov made mortgage payments on the 83-83 Property.

69. The mortgage payments that Irina Khaimov made on the 83-83 Property were the proceeds of the mortgage fraud and bank fraud described in paragraphs 11-29 above.

70. On or around March 21, 2006, Irina Khaimov transferred 100% of the ownership interest in the 83-83 Property to her mother Basanda Khaimov at a sale price of approximately $623,000.

71. On or around March 21, 2006, Basanda Khaimov completed a mortgage loan application to refinance the then existing mortgage on the 83-83 Property.

72. In that mortgage loan refinance application, Basanda Khaimov made fraudulent representations to her mortgage lender in order to obtain a refinancing mortgage on the 83-83 Property.

73. Among the fraudulent representations on that application were (i) Basanda Khaimov's grossly inflated income, (ii) her grossly inflated assets and (iii) her fraudulent statements about the duration, nature and quality of her employment.

74. Specifically, Basanda Khaimov fraudulent represented in her loan application for the mortgage on the 83-83 Property, that she had worked for an insurance company for 15 years.

75. In addition, Basanda Khaimov fraudulently represented in her loan application for the mortgage on the 83-83 Property that her <u>monthly</u> income was $8,500.

76. In contrast, in her 2006 income taxes, Basanda Khaimov reported <u>annual</u> income of $13,966.

77. Similarly, in her 2006 income taxes, Basanda Khaimov identified her profession as a home attendant.

78. After the refinancing and transfer of the 83-83 Property to Basanda Khaimov, Irina Khaimov and Basanda Khaimov used the 83-83 Property as the offices for Nikki Kind.

79. Upon information and belief, the annual mortgage payments and real estate taxes for the $600,000 mortgage on the 83-83 Property are in excess of Basanda Khaimov's annual income.

80. Upon information and belief, to the extent that monthly payments have been made on the 83-83 Property after the transfer to Basanda Khaimov, these monthly payments have been made with the proceeds of mortgage fraud and bank fraud.

>The Ralph Avenue Property Was Acquired With
>The Proceeds of Bank Fraud and/or
><u>With Fraudulent Representations</u>

81. On or about July 17, 2006, Nikki Kind, Inc. purchased the Ralph Avenue Property for approximately $450,000.

82. Nikki Kind, Inc. was a shell corporation that Irina Khaimov formed and controlled.

83. Irina Khaimov funded Nikki Kind with the proceeds of mortgage fraud and bank fraud.

84. The $450,000 that Nikki Kind used to purchase the Ralph Avenue Property were the proceeds of the mortgage fraud and bank fraud described in paragraphs 11-29 above.

### The Oakley Street Property Was Acquired With The Proceeds of Bank Fraud and/or With Fraudulent Representations

85. On or about September 25, 2006, Coster Callus, Inc. purchased the Oakley Street Property for approximately $320,000.

86. Coster Callus, Inc. was a shell corporate entity that Irina Khaimov formed and controlled to help her commit mortgage fraud and bank fraud.

87. Irina Khaimov funded Coster Callus with the proceeds of mortgage fraud and bank fraud.

88. The $320,000 that Coster Callus used to purchase the Oakley Street Property were the proceeds of the mortgage fraud and bank fraud described in paragraphs 11-29 above.

### The McKinley Avenue Property Was Acquired With The Proceeds of Bank Fraud and/or With Fraudulent Representations

89. On or about April 3, 2006, Nikki Kind, Inc. purchased the McKinley Avenue Property for approximately $380,000.

90. Nikki Kind, Inc. was a shell corporation formed and controlled by Irina Khaimov.

91. Irina Khaimov funded Nikki Kind with the proceeds of mortgage fraud and bank fraud.

92. The $380,000 that Nikki Kind used to purchase the McKinley Avenue Property were the proceeds of the mortgage fraud and bank fraud described in paragraphs 11-29 above.

### FIRST CLAIM FOR RELIEF

(Forfeiture Arising Based On
Bank Fraud and Fraudulent Representations)

93. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 92 as if set forth fully herein.

94. The Defendant Properties-In-Rem were acquired with the proceeds of bank fraud and/or by the knowing execution or attempts to execute schemes or artifices to obtain money, funds and/or credits from financial institutions by means of false or fraudulent pretenses or representations.

95. The Defendant Properties-In-Rem are real properties that constitute or are derived from proceeds traceable to the commission of bank fraud, as set forth in 18 U.S.C. § 1344.

96. As a result of the foregoing, the Defendant Properties and all proceeds traceable thereto, including, but not limited to, sale income, rental income and/or other income derived therefrom, are liable to condemnation and forfeiture to the United States in accordance with 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR RELIEF

(Forfeiture Based On
Money Laundering)

97. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 92 as if set forth fully herein.

98. The Defendant Property-In-Rem the 83-83 Property represented the proceeds of some form of unlawful activity and was used with the intent to promote the carrying on of such unlawful activity, including, but not limited to, being used as the office for the corporate entity Nikki Kind that was used to perpetuate such fraud in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

99. All of the Defendant Properties-In-Rem were involved in transactions, including, but not limited to, their purchases, that were designed in whole or part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the mortgage fraud and bank fraud described in paragraphs 11-29 above in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

100. As a result of the foregoing, the Defendant Properties-In-Rem and all proceeds traceable thereto, including, but not limited to, sale income, rental income and/or other income derived therefrom, are liable to condemnation and forfeiture to the United States in accordance with 18 U.S.C. § 981(a)(1)(C).

WHEREFORE, plaintiff United States of America requests that, pursuant to 18 U.S.C. §§ 983 and 985, notice of this Verified Complaint be issued as to the Defendant Properties-In-Rem; that due notice of these proceedings be given to all interested persons; that, after further proceedings, the Defendant Properties-In-Rem be forfeited and condemned to the use and benefit of the United States of America; and that plaintiff be awarded its costs and disbursements in this action and for such other and further relief as this Court deems just and proper.

Dated:   Brooklyn, New York
         August 13, 2010

                         LORETTA E. LYNCH
                         United States Attorney
                         Eastern District of New York
                         Attorney for Plaintiff
                         271 Cadman Plaza East, 7th Floor
                         Brooklyn, New York 11201

By: _____
    Artemis Lekakis
    Assistant United States Attorney
    (718) 254-6096

## VERIFICATION

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and, as such, have knowledge of the facts underlying this action.

2. I have read the within verified complaint _in rem_ and know the contents thereof.

3. The matters contained in the within verified complaint _in rem_ are true and accurate to the best of my knowledge, information and belief.

4. The source of my information and the grounds for my belief are my personal knowledge, information provided by other law enforcement officers and the official files and records of FBI and other federal, state and local agencies.

I, declare under penalty of perjury that the foregoing is true, to the best of my knowledge, information, and belief.

Dated:   Brooklyn, New York
         August 13, 2010

_____
PATRICK C. DALY
Special Agent
Federal Bureau of Investigation